# No. 13-16070

## In the United States Court of Appeals for the Ninth Circuit

### Realtek Semiconductor Corporation,

Plaintiff and Appellee,

vs.

### LSI Corporation and Agere Systems LLC,

Defendants and Appellants.

---

## ANSWER BRIEF OF APPELLEE REALTEK SEMICONDUCTOR CORPORATION
## (Redacted)

---

Appeal From An Order Granting A Motion For A Preliminary Injunction
United States District Court, Northern District of California
No. 5:12-cv-03451, The Honorable Ronald M. Whyte

---

Scott D. Baker (SBN 84923)
Paul D. Fogel (SBN 70859)
William R. Overend (SBN 180209)
James A. Daire (SBN 239637)
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
Telephone:     415 543 8700
Facsimile:     415 391 8269

Steven S. Baik (SBN 184622)
Carina M. Tan (SBN 185015)
REED SMITH LLP
1510 Page Mill Road, Suite 110
Palo Alto, CA 94304-1127
Telephone:     650 352 0500
Facsimile:     650 352 0699

*Attorneys for Plaintiff and Appellee*
*Realtek Semiconductor Corporation*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT

I    INTRODUCTION    1

II   STATEMENT REGARDING JURISDICTION    5

III  COUNTERSTATEMENT OF ISSUES AND STANDARDS OF REVIEW    5

IV   STATEMENT OF FACTS AND PROCEDURAL HISTORY    6

    A.    The Parties    6

    B.    Defendants' Contract With The IEEE    7

    C.    Nine Years After Initial Licensing Communications Relating To An Outdated 802.11 Standard And One Product, Defendants Send Realtek A Cease-And-Desist Letter But Do Not Offer Realtek A License On RAND Terms    10

    D.    The Same Day Realtek Receives Defendants' Cease-And-Desist Letter, Defendants File A Complaint In The International Trade Commission, Seeking An Order Excluding Realtek's Products From Entering The United States    12

    E.    Although Realtek Seeks A RAND Offer In Response To Defendants' ITC Complaint, Defendants Do Not Provide One    13

    F.    Based On Defendants' Breach Of Their RAND Licensing Obligations, Realtek Files This Breach Of Contract Action In District Court    15

# TABLE OF CONTENTS
## (CONTINUED)

Page

G. The District Court Grants Realtek's Motion For Partial Summary Judgment On Liability, Rejects Defendants' Claim That Essential Discovery Was Incomplete, And Issues A Conditional Preliminary Injunction ... 16

H. After Defendants' Appeal, The ITC Initially Determines That Realtek Is Not Infringing Defendants' Patents ... 19

V SUMMARY OF ARGUMENT ... 20

VI ARGUMENT ... 21

A. This Court Should Dismiss This Appeal Because The District Court's Preliminary Injunction Has Not Yet Taken Effect ... 21

B. The District Court's Order Granting The Conditional Preliminary Injunction Was Not An Abuse Of Discretion ... 30

1. The District Court Properly Found That Realtek Is Likely To Succeed On The Merits Of Its Breach Of Contract Claim ... 31

a. The Court's Ruling Was Based On Defendants' Undisputed Contract With The IEEE ... 31

b. The Court Did Not Adopt A *Per Se* Rule Against Injunctive Relief ... 33

c. The Court Correctly Found That The 2002-2003 Correspondence Did Not Satisfy LSI's RAND Obligations ... 40

d. The Court Properly Found That Realtek Was A Willing Licensee ... 43

**TABLE OF CONTENTS**
**(CONTINUED)**

Page

e.    The Court Properly Denied Defendants' Request For A Discovery Continuance    47

2.    The District Court Correctly Found That Realtek Established A Threat Of Irreparable Harm    50

a.    The Court Correctly Rejected Defendants' Argument That Realtek's Request For Preliminary Injunctive Relief Was Untimely    51

b.    The Court Correctly Found That Without A Preliminary Injunction, Realtek Would Suffer Irreparable Harm To Its Reputation, Customer Relationships, And Business    53

3.    The District Court Properly Found That The Balance Of The Equities And The Public Interest Favored A Preliminary Injunction    55

VII    CONCLUSION

STATEMENT OF RELATED CASES

CERTIFICATION OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Apple, Inc. v. Motorola Mobility, Inc.*,
  2011 WL 7324582 (W.D. Wis. June 7, 2011) ............................... 32

*Apple, Inc. v. Motorola Mobility, Inc.*,
  2012 WL 5416941 (W.D. Wisc. Oct. 29, 2012) ........................... 39

*Apple, Inc. v. Motorola, Inc.*,
  869 F.Supp.2d 901 (N.D. Ill. 2012) ........................................ passim

*Armstrong v. Wilson*,
  124 F.3d 1019 (9th Cir. 1997) ................................................... 22

*Arthur Andersen LLP v. Carlisle*,
  556 U.S. 624 (2009) ................................................................. 27

*Beneficial Standard Life Insurance Co v. Madariaga*,
  851 F.2d 271 (9th Cir. 1988) ................................................... 49

*Carson v. American Brands, Inc.*,
  450 U.S. 79 (1981) ...................................................... 21, 23, 27

*Cf. Fox Broadcasting Co., Inc. v. Dish Network, LLC*,
  905 F.Supp.2d 1088 (C.D. Cal. 2011) ..................................... 26

*Compare Jamie S. v. Milwaukee Public Schools*,
  668 F.3d 481 (7th Cir. 2012) ................................................... 25

*Cornwell v. Electra Central Credit Union*,
  439 F.3d 1018 (9th Cir. 2006) ................................................. 49

*Ericsson Inc. v. Samsung Electronics, Co.*,
  2007 WL 1202728 (E.D. Tex. Apr. 20, 2007) ............................. 32

*ESS Technology, Inc. v. PC-Tel, Inc.*,
  1999 WL 33520483 (N.D. Cal. Nov. 4, 1999) ............................. 32

*FTC v. Enforma Natural Products*,
  362 F.3d 1204 (9th Cir. 2004) ................................................... 6

*Gardner v. Westinghouse Broadcasting Co.*,
  437 U.S. 478 (1978) ........................................................ 21, 28

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Harris v. Board of Supervisors, Los Angeles County,*
  366 F.3d 754 (9th Cir. 2004)........................................................ 30

*In re Certain Audiovisual Components & Prods. Containing the
  Same,* Inv. No. 337-TA-837, Notice of Initial Determination,
  2013 WL 3831185 (July 18, 2013)........................................ 19, 23

*Lauro Lines s.r.l. v. Chasser,*
  490 U.S. 495 (1989)................................................................... 28

*Leiva-Perez v. Holder,*
  640 F.3d 962 (9th Cir. 2011)....................................................... 53

*Mandrigues v. World Sav., Inc.,*
  2008 WL 5221074 (N.D. Cal. Dec. 12, 2008)............................. 53

*Microsoft Corp. v. Motorola, Inc.,*
  2012 WL 5993202 (W.D. Wash., Nov. 30, 2012)............. 35, 37, 39

*Microsoft Corp. v. Motorola, Inc.,*
  696 F.3d 872 (9th Cir. 2012).............................................. passim

*Microsoft Corp. v. Motorola, Inc.,*
  854 F.Supp.2d 993 (W.D. Wash. 2012)...................................... 31

Nicholas v. Wallenstein,
  266 F.3d 1083 (9th Cir. 2001)..................................................... 48

*Orange County v. Hongkong and Shanghai Banking Corp., Ltd.,*
  52 F.3d 821 (9th Cir. 1995)................................................... 22, 29

*Pit River Tribe v. United States Forest Service,*
  615 F.3d 1069 (9th Cir. 2010)..................................................... 23

*Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.,*
  944 F.2d 597 (9th Cir. 1991)....................................................... 54

*Research In Motion Ltd. v. Motorola, Inc.,*
  644 F. Supp.2d 788 (N.D. Tex. 2008).......................................... 32

*Southwest Voter Registration Educ. Project v. Shelley,*
  344 F.3d 914 (9th Cir. 2003)....................................................... 30

## TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

*Special Investments, Inc. v. Aero Air, Inc.*,
  360 F.3d 989 (9th Cir. 2004)........................................................ 5

*Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*,
  240 F.3d 832 (9th Cir. 2001)...................................................... 54

*United States v. Associated Air Transport, Inc.*,
  256 F.2d 857 (5th Cir. 1958)................................................. 25, 26

*Warehouse Restaurant, Inc. v. Customs House Restaurant, Inc.*,
  726 F.2d 480 (9th Cir. 1984)............................................ 24, 25, 26

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008) ...................................................... 30, 53

### Statutes

15 U.S.C. § 1114(a)(1) ................................................... 24

15 U.S.C. § 1125(a) ....................................................... 24

19 U.S.C. § 1337............................................................ 12

28 U.S.C. § 1292(a)(1) ........................................... 3, 21, 27

9 U.S.C. § 16(a)(1)(A).................................................. 27

Cal. Bus. & Prof. Code § 17200 ................................... 16

Fed. R. Civ. Proc. 56(d)...................................... 17, 48, 49

# CORPORATE DISCLOSURE STATEMENT

## (Fed. R. App. P. 26.1)

Appellee Realtek Semiconductor Corporation is a Taiwanese corporation whose shares are traded on the Taiwan Stock Exchange. No publicly-held corporation owns ten percent or more of Realtek's stock.

DATED:  October 28, 2013.

REED SMITH LLP

By____*/s/ Paul D. Fogel*_____
        Paul D. Fogel

Attorneys for Plaintiff and Appellee
Realtek Semiconductor Corporation

# I

# INTRODUCTION

This dispute involves certain technical standards that govern protocols for wireless connectivity. Those standards often utilize patented technologies that their patent holders advocate to have included in the standard. Before adopting a patent holder's technology as part of the standard, however, standards-setting organizations (like the Institute of Electronics Engineers (IEEE)) require that for any patent the holder deems essential to the standard (a "standard-essential patent"), the holder must promise to license the patents on reasonable and non-discriminatory ("RAND") terms to companies whose products implement the standard. Without such a promise, a patent holder whose technology is incorporated into the standard could "hold-up" the industry by threatening litigation to exclude competitors from the market or charging exorbitant licensing fees.

In this case, defendants and appellants LSI Corporation and Agere Systems LLC agreed to license their alleged "standard-essential" patents on RAND terms. But they then violated that agreement by initiating a proceeding in the U.S. International Trade Commission (ITC) against plaintiff and appellee Realtek Semiconductor Corporation, alleging that Realtek infringed their patents and seeking an order excluding Realtek's accused products from entering the United States. Defendants did so without first offering to license their patents to Realtek.

This was a breach of the agreement between defendants and the IEEE. Realtek, a third party beneficiary of that agreement, filed a breach of contract suit against defendants in the district court below, seeking damages, and declaratory and injunctive relief. After the parties engaged in discovery, Realtek moved for partial summary judgment on breach of contract, showing that there was no factual dispute and that defendants' ITC complaint constituted a breach of their RAND obligations as a matter of law.

The district court granted Realtek's motion in a detailed order. (Excerpts of Record (ER) 1-15) The court found undisputed evidence that defendants had failed to make any license offer that could satisfy their conceded contractual RAND obligations. (ER/7-11) In addition, characterizing Realtek's motion as a request for preliminary injunctive relief, the court ruled that Realtek had established a likelihood of success on the merits and a likelihood of irreparable harm if a preliminary injunction did not issue and that the balance of equities and the public interest favored a preliminary injunction. (ER/12-14) Based on these findings, the court enjoined defendants "from enforcing any exclusion order or injunctive relief by the ITC that they might obtain against Realtek with respect to the standard essential patents at issue." (ER/14) The court did not make the injunction effective immediately however; rather, it ruled that the injunction "will only go into effect in the event the ITC grants an exclusion order or injunctive relief in favor of defendants." (ER/14 n.6)

Defendants noticed an appeal, claiming the conditional preliminary injunction was appealable under 28 U.S.C. section 1292(a)(1). (All unspecified statutory references are to Title 28 of the United States Code.) But no preliminary injunction has taken effect— i.e., the district court's order does not restrain defendants from doing anything because the ITC has not yet issued (and as explained *post*, until late December 2013 at the earliest, will not issue) any exclusion order or injunctive relief in defendants' favor. Accordingly, this Court lacks jurisdiction and should dismiss this appeal.

If the Court reaches the merits, it should affirm because the district court properly exercised its discretion in issuing a preliminary injunction. There is no dispute that Realtek is a third party beneficiary of defendants' contract with the IEEE such that defendants had to offer it a license on RAND terms. There is also no dispute that defendants breached their contractual obligations in failing to do so—as the district court ruled, relying on *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 (9th Cir. 2012). Thus, the district court properly found that defendants' pursuit of an ITC exclusion order was "inherently inconsistent and a breach of [their] promise to license the patents on RAND terms." (ER/9)

Having correctly found a strong likelihood that Realtek will prevail on the merits, the only remaining inquiry was whether Realtek would suffer irreparable harm if a preliminary injunction did not issue and whether the balance of equities and the public interest favored an injunction. On those issues as well, the district court did not abuse its discretion.

Based on evidence Realtek submitted, the district court found that Realtek acted expeditiously in bringing its motion "soon after one of its major customers contacted it with concerns about the ITC litigation." (ER/12 n.5) It also found, on unchallenged evidence, that the threat of an exclusion order was *already* causing Realtek substantial and irreparable harm to Realtek's chip business because at least two of its customers were concerned about purchasing its products unless they were assured that those products could be sold worldwide. (ER/13)

Balancing the equities, the court found that if Realtek's products were excluded from the United States, Realtek would either "(1) lose its customers who sell, use, or import Realtek's component parts into the United States, or (2) be forced to negotiate a license in the disadvantaged position of having an exclusion order hanging over its head." (*Id.*) Defendants' filing of the ITC action without first making a RAND license offer created an inherently unfair licensing environment—which could be cured only by enjoining them from enforcing any exclusion order. Finally, the court properly found that the public interest favors an injunction because it ensures that essential patents are "are accessible to all comers under RAND terms" and permits Realtek's customers, who rely on its component parts, "to conduct business uninterrupted." (ER/13)

Because the uncontroverted evidence and the law support the district court's findings, if the Court reaches the merits, it should affirm the order granting the preliminary injunction.

## II

## STATEMENT REGARDING JURISDICTION

The district court has diversity jurisdiction pursuant to section 1332(a)(2).  This Court, however, lacks jurisdiction.  By its terms, the district court's preliminary injunction "will only go into effect in the event that the ITC grants an exclusion order or injunctive relief in favor of defendants."  (ER/14 n.6)  The ITC has not issued any such order or relief so there is no operable injunction from which defendants may appeal.

## III

## COUNTERSTATEMENT OF ISSUES AND STANDARDS OF REVIEW

1.      Should this Court dismiss this appeal for lack of jurisdiction, given that the district court expressly precluded any injunction from taking effect unless and until the ITC issues an exclusion order or injunctive relief and the ITC has done neither?  *Special Investments, Inc. v. Aero Air, Inc.*, 360 F.3d 989, 992 (9th Cir. 2004) (reviewing question of jurisdiction de novo).

2.      Assuming this Court has jurisdiction, did the district court abuse its discretion in granting Realtek's motion for a preliminary injunction, given that undisputed evidence showed that defendants breached their conceded contractual obligation to offer Realtek a license on RAND terms, Realtek showed it was suffering irreparable harm from the threat of an ITC exclusion order, and the balance of equities and

public interest favor a preliminary injunction? *Federal Trade Commission v. Enforma Natural Products*, 362 F.3d 1204, 1211-12 (9th Cir. 2004) (preliminary injunction upheld if district court did not abuse its discretion or base its decision on erroneous legal standard or clearly erroneous factual findings).

# IV

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.    The Parties

Realtek, established in 1987, is a Taiwanese fabless integrated circuit design company.  (A "fabless manufacturing" company designs and sells integrated circuits after having contracted with a specialized manufacturer to fabricate, or "fab" the chips.)  (Supplemental Excerpts of Record (SER) 369)  One of Realtek's product lines is integrated circuits for wireless local area networks ("WLAN").  (*Id.*)

Defendant Agere Systems LLC owns two patents (U.S. Patent Nos. 6,452,958 (the "'958 patent") and 6,707,867 (the "'867 patent") that Agere designated as essential to an IEEE standard for WLANs known as "Wi-Fi," or "802.11" (the "802.11 standard").  (ER/2)  In 2007, defendant LSI Corporation acquired Agere, and it is now a wholly-owned LSI subsidiary.  (ER/353, 336)

## B.    Defendants' Contract With The IEEE

The role of standards-setting organizations ("SSOs") in general, and the 802.11 standard in particular, is important to understand defendants' improper pursuit of its ITC investigation against Realtek.

SSOs have come to play an increasingly important role in our economy. (ER/315) Interoperability standards have helped move many important innovations into the marketplace, including the complex communications networks and sophisticated mobile computing devices that are hallmarks of the modern age. These standards incorporate important technical advances that are fundamental to the interoperability of numerous consumer products. (ER/316-17)

Standard setting does not come without risks to implementers, however. When a standard incorporates patented technology and the standard becomes established, switching to a different technology may prove prohibitively difficult and expensive. (ER/317) The owner of the patented technology may consequently gain and take advantage of market power by engaging in "patent hold-up"—asserting patent rights to exclude a competitor from a market or obtain a higher price for the technology's use than would have been possible before the standard was set. (ER/317-19) To reduce such opportunistic conduct, SSOs have relied on commitments by patent holders to license any of their patents that are essential to the standard on RAND terms. (*Id.*)

This case involves the 802.11 wireless networking standard, which the IEEE's Standards Association (IEEE-SA), the IEEE's standards-setting arm, began developing in the early 1990s. The IEEE-SA relies on licensing commitments from owners of patents that relate to its technical standards, including 802.11. The IEEE-SA has policies that apply when a participant in standards-setting efforts owns a patent or patent application the participant deems "essential" to the standard. (SER/75, 77-78)

At all relevant times during the drafting of the 802.11 standard, the IEEE-SA maintained a policy that required "Letters of Assurance" from owners of patents or patent applications that may be essential to the standard. (*See* ER/345) The IEEE-SA Standards Board Bylaws require that a Letter of Assurance include a statement by the patent owner that it will (1) not enforce any standard-essential patents against persons or entities seeking to use the standard in their products, or (2) offer to license those patents without compensation or on RAND terms. The Bylaws thus required:

> a)     A disclaimer that the submitter, without conditions, will not enforce any present or future Essential Patent Claims against any person or entity making, using, selling, offering to sell, importing, distributing, or implementing a compliant implementation of the standard; or

> b)     A statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis, without compensation or under reasonable rates, with

reasonable terms and conditions that are demonstrably free of any unfair discrimination.

(SER/95)  According to the IEEE's policies, Letters of Assurance, once provided, are irrevocable and are in force at least until the standard's withdrawal.  (SER/95, 107)

Agere submitted several of these Letters of Assurance to the IEEE, guaranteeing that any "essential" patents would be licensed under RAND terms and conditions.  (SER/110-14)  Agere submitted Letters of Assurance in January 2003 and September 2004, identifying the '958 and '867 patents (the latter by its application number, U.S. Application No. 10/092,295) as including "one or more claims that may be required to practice" the IEEE 802.11e and 802.11g standards.  Consistent with the IEEE's policies, those Letters stated that Agere was "prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to comply with the [Proposed] IEEE Standard." (*Id.*)  Agere also submitted a substantially similar letter relating to the IEEE 802.11n standard in September 2004, but without identifying patents. (*Id.*)

Defendants did not dispute below that they are bound by these commitments and are thus obligated to license the '958 and '867 patents on RAND terms for asserted compliance with IEEE 802.11e, 802.11g, and/or 802.11n.  (SER/103-06, 121-23)

**C.    Nine Years After Initial Licensing Communications Relating To An Outdated 802.11 Standard And One Product, Defendants Send Realtek A Cease-And-Desist Letter But Do Not Offer Realtek A License On RAND Terms**

The parties' contact with one another began in 2002 and 2003, before Agere had submitted the Letters of Assurance at issue.  On October 22, 2002, Agere wrote Realtek for the first time concerning Agere's alleged standard "essential" patent rights, claiming Agere "possesses essential patent claims that relate to Realtek's 802.11b-based wireless networking products"—an early version of the IEEE 802.11 standard.  (ER/204-05)



Importantly, the letter mentioned only a possible license for implementing the early 802.11b version of the standard and not any subsequently-developed amendments.  (SER/176)

The parties exchanged additional letters over the next few months (ER/206-19), with Realtek asking Agere to provide a detailed analysis comparing its products and the alleged essential claims. (ER/215)  Agere ignored that request and attempted instead to arrange a conference call, never giving Realtek its requested detailed infringement analysis.

(ER/215, 217)   The parties ceased contact shortly thereafter, and it appeared that Agere had dropped the matter.

Defendants did not communicate with Realtek again for nine years, until LSI's Vice-President of Intellectual Property Business, Warren K. Waskiewicz, sent a March 7, 2012 letter to Realtek, which Realtek received on March 12.   (ER/221)   (All further unspecified references to dates are to dates in 2012.)   In that letter, defendants asserted that certain Realtek component products, as incorporated into consumer products sold by Funai, infringe the '958 and '867 patents. (*See id.*)   Defendants demanded that Realtek immediately cease and desist the alleged infringement.   (*Id.*; *see also* SER/169-70 (confirming letter's purpose was to demand that Realtek stop the alleged infringement))   The letter did not contain any license terms or license offer.   (SER/127-29, 170, 174-75)

It is undisputed that defendants were obligated to offer a license to the '958 and '867 patents on RAND terms for the accused 802.11 standards at the time they sent their cease-and-desist letter and that the failure to do so was inherently "unreasonable."   (SER/119-21)   Because the March 7 letter did not contain any offer and instead demanded that Realtek immediately confirm that it had stopped its allegedly infringing conduct, it did not discharge defendants' contractual obligations to offer a license on RAND terms.   (SER/110-14 (letters of assurance))

**D.    The Same Day Realtek Receives Defendants' Cease-And-Desist Letter, Defendants File A Complaint In The International Trade Commission, Seeking An Order Excluding Realtek's Products From Entering The United States**

Less than a week after sending the cease-and-desist letter (and the same day Realtek received the letter in Taiwan), defendants filed a complaint with the ITC against Realtek, Funai and others.  (*See generally* ER/224-93)  Among other things, the complaint alleged that Realtek had infringed the '958 and '867 patents, the same patents defendants identified as essential to practice the 802.11 standard in their Letters of Assurance to the IEEE.  (ER/275-76)  ███████████████████████████████████████████████████████████████████  Unlike the remedies available to a patentee in a federal court infringement lawsuit, the only remedy available in the ITC is an exclusion order.  *See* 19 U.S.C. § 1337.  Defendants requested a "limited exclusion order" that would exclude the accused Realtek products from entering the United States; and (2) "permanent cease-and-desist orders" barring Realtek from importing the accused products into the United States.  (ER/291-92)  Defendants conceded below they consider seeking an injunction a way to obtain "leverage" in their negotiations.  (SER/138-39)

Defendants initiated the ITC action without making any licensing proposal to Realtek that could satisfy their RAND obligations.

Defendants conceded that the cease-and-desist letter was not an offer. (SER/127-29, 170, 174-75)   And in the narrow five-day window between sending that letter overseas and filing its ITC complaint, defendants made no license proposal or any attempt to negotiate. (SER/129-30)

Notably, defendants now claim that LSI's October 22, 2002 letter satisfied their RAND obligations as to the '958 and '867 patents. However, that letter, even if a license offer, did not mention 802.11e, 802.11g, 802.11n, or any other 802.11 standards or any product allegedly compatible with those standards.  As such, it could not have satisfied defendants' RAND obligations as to Realtek's current accused products and the post-2002 developed 802.11e, 802.11g, 802.11n, and other 802.11 standards, which did not exist at the time.  (SER/110-14) Moreover, the '867 patent did not exist yet and the "offer" covered only one product.  (ER/204-05)

**E.    Although Realtek Seeks A RAND Offer In Response To Defendants' ITC Complaint, Defendants Do Not Provide One**

On April 11, the ITC instituted an investigation based on defendants' complaint.  (SER/268-71)  The following month, Realtek asked defendants to give it an offer to license the '867 and '958 patents consistent with defendants' RAND obligations.  (ER/295)

On June 20, defendants responded to Realtek's request with a license proposal.  (ER/297-310)

- 13 -



Based on their definition, defendants calculated what they believed Realtek should pay for every sale of a Realtek Wi-Fi chip.





**F.    Based On Defendants' Breach Of Their RAND Licensing Obligations, Realtek Files This Breach Of Contract Action In District Court**

After receiving defendants' proposal, Realtek filed a complaint in the Northern District of California, alleging defendants had breached their RAND licensing obligations by (1) initiating the ITC action without first offering a license to Realtek, and (2) making the inherently unreasonable June 2012 proposal. (ER/351-71) Realtek alleged breach of contract and promissory estoppel, sought a declaratory judgment that defendants must offer Realtek a RAND license or declare that the alleged "standard-essential" patents are unenforceable as to Realtek, and sought injunctive and other relief. (ER/361-65) (Although Realtek also

alleged unfair competition under Cal. Bus. & Prof. Code § 17200, on defendants' motion, the district court dismissed that claim.  (SER/1-10)

After the parties took discovery, Realtek moved for partial summary judgment on its breach of contract claim, claiming defendants had breached their RAND obligations by initiating the ITC action without first offering Realtek a license for the '958 and '867 patents. (ER/171-98)  (Although Realtek also claims defendants' June 2012 proposal breached their RAND obligations, it did not move for summary judgment on that ground.)  Realtek also sought to enjoin defendants from enforcing any exclusion order or injunctive relief the ITC might issue until after the RAND license offer dispute was resolved in district court.  (ER/175)

**G.     The District Court Grants Realtek's Motion For Partial Summary Judgment On Liability, Rejects Defendants' Claim That Essential Discovery Was Incomplete, And Issues A Conditional Preliminary Injunction**

Following briefing (ER/50-73, 171-98, SER/11-28), on May 20, 2013, the district court granted Realtek's motion in a 15-page order (ER/1-15 ("Order"))

The court found that before defendants filed their ITC complaint, they had failed to make any offer that could satisfy their RAND obligations.  (ER/11)  It noted defendants had made no meaningful argument that they offered a RAND license to Realtek before naming Realtek in their ITC complaint.  (*Id.*)  The court rejected defendants'

argument that the 2002 and 2003 correspondence satisfied defendants' RAND obligations, stating: (1) "the 802.11b standard is neither the standard at issue in the ITC litigation nor is it the subject of the RAND commitments in Agere's Letters of Assurance to the IEEE in the record before the court; (2) the parties ceased communications before any specific offer was ever actually made; and (3) Realtek continued to sell its Wi-Fi/802.11 component parts for almost nine years thereafter without hearing from defendants, implying that defendants were no longer seeking to license their declared standard-essential patents to Realtek." (*Id.*)

The court also rejected defendants' argument that they had been deprived of discovery necessary to oppose Realtek's motion. *See* Fed.R.Civ.P. 56(d). The additional discovery they sought, the court explained, was "only pertinent to the court's *later* determination of an appropriate RAND rate" and did not affect the "limited issue of whether the initiation of the ITC action *before offering any license* was a breach of defendants' RAND obligations." (ER/11 (orig. ital.)) Other issues, such as the reasonableness of defendants' June proposal and the appropriate RAND rate, were not at issue in Realtek's motion.

Moreover, before filing its motion, Realtek had made a corporate witness available to defendants on whether initiating the ITC action breached defendants' RAND obligations, including (1) Realtek's membership in the IEEE and its status as an intended beneficiary of commitments made to the IEEE; (2) Realtek's understanding of defendants' commitments to the IEEE, including their RAND

- 17 -

commitments; and (3) the harm defendants' actions caused to Realtek, including lost sales and market share, diminished brand loyalty, and damage to reputation.    (SER/31)    Defendants' list of remaining deposition topics (listed at AOB/13-14) may have been relevant to other issues, but were not essential—or even relevant—to resolve Realtek's motion for partial summary judgment.

The court also rejected defendants' argument that expert discovery was essential to resolve Realtek's motion.    (ER/11)    The motion presented a pure legal question based on defendants' undisputed pre-ITC proceeding conduct and the contractual commitments in their Letters of Assurance to the IEEE.  (*See id.*)

Finally, characterizing Realtek's motion as a request for preliminary injunctive relief, the court analyzed the preliminary injunction factors and ruled that Realtek had established a likelihood of success on the merits and a likelihood of irreparable harm if a preliminary injunction did not issue.  (ER/12 & n.5)  The court also ruled that the equities and the public interest favored a preliminary injunction.  (ER/13)  Based on these findings, the court enjoined defendants "from enforcing any exclusion order or injunctive relief by the ITC that they might obtain against Realtek with respect to the '958 and '867 declared standard essential patents."    (ER/14)    In an all-important footnote, however, the court stated that the preliminary injunction would not take effect immediately; rather, it would spring into effect *only* if and when the ITC issues an exclusion order or injunctive relief:

[6] This preliminary injunction *will only go into effect in the event that the ITC grants an exclusion order or injunctive relief in favor of defendants.* The ITC may, of course, still analyze Realtek's claims and defenses independently, and may find no Section 337 violation in any event. In that instance, this preliminary injunction will become moot. (ER/14 n.6, ital. added)

## H.    After Defendants' Appeal, The ITC Initially Determines That Realtek Is Not Infringing Defendants' Patents

Defendants filed a timely notice of appeal from the May 20 Order, predicating appellate jurisdiction on section 1292(a)(1), which permits an appeal from a preliminary injunction. (ER/19-20) After unsuccessfully meeting and conferring, Realtek moved to dismiss the appeal on the ground that no preliminary injunction had taken effect. (Dkt. No. 6)

In the meantime, proceedings continued in the ITC. On July 18, 2013, the Administrative Law Judge made an initial determination that Realtek does not infringe the '958 and '867 patents. *See In The Matter Of Certain Audiovisual Components And Products Containing The Same Notice,* USITC Inv. No. 337-TA-837, Notice of Initial Determination, 2013 WL 3831185 (July 18, 2013) ("Initial Determination"). Defendants petitioned the full ITC for review of that Determination. (Mot. Jud. Not., Ex A) For its part, Realtek filed a contingent petition for review of the Initial Determination, arguing that if the ITC does review the Initial Determination, it should also review the ALJ's

determination as to other Realtek defenses, including defendants' failure to establish a domestic industry, unenforceability of the patents due to RAND commitments, and equitable estoppel.  (*Id.*, Ex. B)  On October 17, 2013, the ITC issued a notice that it would review the Initial Determination in its entirety.  (*Id.*, Ex. C)  Thus, the ITC investigation continues as to Realtek, and Realtek continues to be forced to defend itself against defendants' assertion of alleged standard-essential patents and the threat of an exclusion order.

Back in this Court, defendants filed an opposition to Realtek's motion to dismiss, Realtek filed a reply, and the parties filed supplemental submissions (which included discussion of the district court's July 12, 2013 order denying defendants' motion to certify the partial summary judgment aspect of the Order for interlocutory appeal under section 1292(b).  (Dkt. Nos. 8-10, 12-14)  On August 2, 2013, the Appellate Commissioner issued an order denying Realtek's motion to dismiss without prejudice to renewing the arguments in the answering brief.  (Dkt. No. 16)

## V
## SUMMARY OF ARGUMENT

Because the ITC has neither granted an exclusion order nor injunctive relief in defendants' favor, the district court's order does not prohibit or require conduct by either side, and noncompliance with the order would not subject defendants to contempt.  The order is therefore not appealable and this Court should dismiss defendants' appeal.

If the Court concludes it has jurisdiction, it should affirm the order and find that the district court properly exercised its discretion in granting Realtek's motion for a preliminary injunction. The undisputed evidence showed that defendants breached their conceded contractual obligation to offer Realtek a license on RAND terms, that Realtek was suffering irreparable harm from the threat of an ITC exclusion order, and that the balance of equities and public interest favor an injunction.

## VI
## ARGUMENT

### A.    This Court Should Dismiss This Appeal Because The District Court's Preliminary Injunction Has Not Yet Taken Effect

This Court lacks jurisdiction over this appeal because the May 20 Order is not a preliminary injunction from which an interlocutory appeal lies. Although section 1292(a)(1) permits an immediate appeal from an interlocutory order granting an injunction, the statute's purpose is to permit litigants to challenge interlocutory injunctive orders that may have "serious, perhaps irreparable consequence[s]" before the litigant suffers those "consequences." *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981). That said, as with all exceptions to the one-final-judgment requirement, courts construe section 1292(a)(1) narrowly. *Id.*; *Gardner v. Westinghouse Broadcasting Co.*, 437 U.S. 478, 481-82 (1978) (courts should construe § 1292(a)(1) "somewhat gingerly lest a floodgate be opened that brings into the exception many pretrial orders").

- 21 -

Central to whether this Court has jurisdiction is whether the district court issued an appealable preliminary injunction. The Order shows that it didn't.

An injunction is enforceable by contempt and designed to protect some or all of the relief sought in the complaint. *Orange County v. Hongkong and Shanghai Banking Corp., Ltd.*, 52 F.3d 821, 825 (9th Cir. 1995). This functional analysis, and not the order's label, matters for appealability purposes, since even if "the district court titled its order an 'injunction,' and … the parties might have understood it as such," that "does not end [this Court's] inquiry." *Armstrong v. Wilson*, 124 F.3d 1019, 1021 (9th Cir. 1997).

Here, the Order does not constitute an appealable injunction. Although the district court found that Realtek satisfied the requirements for preliminary injunctive relief, the preliminary injunction portion of its Order is not presently enforceable by contempt. Indeed, defendants conceded as much in their opposition to Realtek's motion to dismiss this appeal. (Dkt. 8-1 at 2 ("*once the exclusion order is in place*, and *when the exclusion order is in place*, LSI faces the threat of contempt" (ital. added)), 11 ("*when the exclusion order is entered by the ITC*, LSI may face contempt should it act to enforce the exclusion order" (ital. added))[1]

---

[1]    Surprisingly, defendants do not mention the district court's caveat that its preliminary injunction will take effect only if the ITC issues an exclusion order. As a result, they assume without analysis that this Court has jurisdiction under section 1292(a)(1), and direct the Court to

(fn. continued on next page)

It is undisputed that there was no exclusion order in effect when the district court issued its order. And it is undisputed that there is no such order in effect now. As noted, after the district court issued its Order, the ALJ issued an Initial Determination, recommending that an exclusion order *not* be issued against Realtek based on non-infringement of the '958 and '867 patents. *See* Initial Determination, 2013 WL 3831185. As also noted, the ITC recently decided to review the Initial Determination in its entirety, with an opinion from the full Commission expected in late December 2013 (the initial target date was December 9, 2013, but was tolled due to the federal government shutdown). (MJN Ex. 3) While the threat of irreparable harm posed to Realtek by a potential exclusion order remains, unless and until the ALJ's Initial Determination is reversed and an exclusion order or other injunctive relief issues, defendants face no prospect of being held in contempt of the district court's Order.

The factors this Court examines confirm that there is no appealable injunction now in effect. Those factors are (1) whether the order has the practical effect of entering or refusing to enter an injunction; (2) whether the order might have serious, perhaps irreparable consequences; and (3) whether an immediate appeal is the only way to effectively challenge the order. *Carson*, 450 U.S. at 83; *see Pit River*

---

(fn. cont'd from previous page)
their Opposition to Realtek's motion to dismiss the appeal (Dkt. 8-1) should the Court have concerns about its jurisdiction. (AOB/1)

*Tribe v. United States Forest Service*, 615 F.3d 1069, 1077-78 (9th Cir. 2010).

First, the Order has no "practical" injunctive effect—and won't unless and until the ITC issues an exclusion order and/or injunctive relief against Realtek. Indeed, the Order emphasizes that the ITC might not issue an exclusion order at all, given that the ITC "may find no Section 337 violation in any event." (ER/14 n.6) (And, as explained *ante,* the ALJ has initially determined that no infringement occurred.) Because the order expressly contemplates and awaits "future events," it does not direct defendants to do or refrain from doing anything. This robs the order of any injunctive effect, dooming defendants' appeal.

*Warehouse Restaurant, Inc. v. Customs House Restaurant, Inc.*, 726 F.2d 480, 481 (9th Cir. 1984), illustrates. There, the district court found that Custom House's logo colorably imitated the registered service mark of Warehouse Restaurant, in violation of 15 U.S.C. section 1114(a)(1), and that Custom House's use of dining booths encased in packing crates was a false designation of origin under 15 U.S.C. section 1125(a). The district court purported to enjoin Custom House from using dining booths encased in packing crates, but its order also stated that Custom House "may continue to use that interior feature until plaintiffs' and defendants' restaurants, or their licensees or franchisees, come into direct competition, or are imminently about to come into direct competition, within the same regional restaurant service area." 726 F.2d at 481 (quoting district court op.).

This Court held that the order's conditional nature rendered it nonappealable, requiring dismissal of the appeal. *Id.* This was "because the district court's deferral of the dining booth injunction makes its judgment non-final and thus not within this court's purely statutory jurisdiction." *Id.* at 480. As this Court explained, "liability for an injunction was found but no injunction was granted – the matter was held in abeyance, awaiting future events ...." *Id.* at 481; *see also United States v. Associated Air Transport, Inc.*, 256 F.2d 857, 861 (5th Cir. 1958) (injunction order stating it was not "effective" until prevailing parties posted injunction bonds was "without operative effect" and nonappealable; "'no appeal lies from an order or decree which is conditional only and the finality of which depends upon certain contingencies which may or may not occur' [Citation]"). *Compare Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 491 (7th Cir. 2012) (order in class action establishing procedural scheme for school district's structural reform immediately appealable as injunction even though identity of compliance monitor and class notice details not decided; district's obligations under order "were not contingent on those details").

Defendants have pointed to no authority to support their argument that this Court may deem the Order appealable merely because an injunction *may* take effect *if* the ITC issues an exclusion order. (*See* Dkt. No. 8-1 at 10-13) The conditional, nonappealable order cases discussed above involved situations in which the orders would become injunctive

in nature once *a party* (rather than a *third party*) took certain actions.[2] But neither case suggests, much less holds, that an order effective only when a third party takes action differs such that in "practical effect" the order is appealable.

The timing and substance of future ITC action is wholly beyond the parties' control, and defendants recognize that no order will be forthcoming from the full Commission until December 2013 at the earliest. That the district court's preliminary injunction, by its terms, becomes effective only if the ITC reverses the ALJ and issues an exclusion order or injunction confirms that the Order lacks the requisite hallmarks of an appealable injunction.[3]

---

[2]    In *Warehouse Restaurant*, 726 F.2d at 481, the order would not become injunctive unless and until the competitors "come into direct competition, or are imminently about to come into direct competition, with the same regional restaurant service area." And in *Associated Air Transport*, 256 F.2d at 861, the order would not "be considered effective" as an injunction until the prevailing parties posted injunction bonds.

[3]    Defendants' argument that they will suffer "'serious, perhaps irreparable consequences'" if they cannot now appeal (Dkt. 8-1 at 12 n.2) is misplaced. Unless defendants can show that the Order bears *all* the hallmarks of an appealable injunction—and they can't—the Order is not appealable. Moreover, defendants' claim that their expenditure of "significant resources" (*id.*) in the ITC proceeding may be for naught is not an "irreparable" consequence that warrants interlocutory appellate review. *Cf. Fox Broadcasting Co., Inc. v. Dish Network, LLC*, 905 F.Supp.2d 1088, 1110 (C.D. Cal. 2012) (economic injury alone typically will not support irreparable harm finding).

Defendants also have failed to show that allowing an immediate appeal is the only way they effectively can challenge the Order. To the

(fn. continued on next page)

Defendants also confuse and conflate the Order's *correctness* with its appealability. Appealability turns on whether it issued an order that is presently enforceable by contempt and that has the "practical effect" of an injunction—and not on whether it issued any such order *correctly*. An appeal lies only if what the court *did* fits into the "limited exception to the final-judgment rule" that Congress carved out in section 1292(a)(1). *Carson*, 450 U.S. at 84. Even if the court *incorrectly* found that Realtek satisfied the preliminary injunction factors (although it didn't), any such error does not create appellate jurisdiction.

*Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 628 (2009) illustrates why the merits are irrelevant to appealability. *Carlisle* examined the appealability of an order under a provision of the Federal Arbitration Act, which specifies that an "appeal may be taken from … an order … refusing a stay of any action" under 9 U.S.C. section 16(a)(1)(A):

> Jurisdiction over the appeal … 'must be determined *by focusing upon the category of order appealed from, rather than upon the strength of the grounds for reversing the order.*' [Citation] The jurisdictional statute here unambiguously makes the underlying merits irrelevant, for even utter frivolousness of the underlying request for a § 3

---

(fn. cont'd from previous page)

contrary, refraining from reviewing the Order until it is known what (if anything) defendants are enjoined from doing would be more effective and efficient than reviewing an order that does not (and may never) have any injunctive component.

stay cannot turn a denial into something other than "an order ... refusing a stay of any action under [9 U.S.C. § 16(a)].

(Ital. added)  *See also Lauro Lines s.r.l. v. Chasser*, 490 U.S. 495, 501 (1989) (appealability of order under collateral order doctrine "turns on the precise contours of the right asserted, and not upon the likelihood of eventual success on the merits").

Section 1292(a)(1) permits an appeal from certain categories of orders, including "[i]nterlocutory orders of the district courts ... granting, ... injunctions...."  *Id.*  The statute does not permit an appeal from an order that does not fit into those categories merely because a party contends the order is erroneous.  Indeed, to accept defendants' argument would eviscerate the one-final judgment rule by making *any* interlocutory order immediately appealable.  That is the antithesis of the approach the courts take in applying the rule's narrow exceptions.  *See Gardner*, 437 U.S. at 481-82.

Lastly, defendants argued in their Opposition that Realtek cannot now contend that the Order is not appealable because it previously advised the district court of the irreparable nature of the harm it was suffering and would continue to suffer if injunctive relief were denied. (Dkt. 8-1 at 1, 6)  However, the arguments Realtek made below are neither inconsistent with nor relevant to appealability.

Among the factors Realtek had to satisfy was that without an injunction it would likely suffer irreparable harm.  (ER/12)  Realtek established that it was "fac[ing] the immediate threat of real and irreparable harm if defendants obtain an exclusion order [in the section 337 proceeding] before the RAND issues are tried in this case."  (ER/195-96)  It presented unrefuted evidence that customers were concerned about the "cloud" that would be created by a possible injunction on importing its products and that customers would "not buy from [Realtek] if this is not cleared up."  (ER/13, 39, 64; SER/365-67, 369-74, 376)

The district court found that Realtek was being irreparably harmed by the mere spectre of defendants obtaining affirmative relief from the ITC.  (ER/12: "Realtek has shown that the threat of an exclusion order has harmed its reputation and poses an imminent threat of customer and revenue loss.  The record shows that at least two of Realtek's major customers have contacted Realtek to express concerns about the pending ITC action.")  The Order then ameliorates (but does not eliminate) Realtek's harm by, for example, giving Realtek something to show its customers.

Realtek's showing on this point, however, does not mean that the Order qualifies as an appealable injunction.  To do so, as explained, the Order must restrain defendants such that their failure to adhere to that "restraint" would subject them to contempt.  *Orange County,* 52 F.3d at 825.  As things currently stand, the Order does not restrain defendants from doing anything.

- 29 -

In sum, because the district court's preliminary injunction has yet to come into effect, it is not appealable. This Court should dismiss defendants' appeal for lack of jurisdiction.

**B.    The District Court's Order Granting The Conditional Preliminary Injunction Was Not An Abuse Of Discretion**

This Court's review of a decision regarding a preliminary injunction "is limited and deferential." *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc). The Court "do[es] not review the underlying merits of the case.… Rather, [its] inquiry is at an end once [it] determine[s] that the district court employed the appropriate legal standards which govern the issuance of a preliminary injunction, and ... correctly apprehended the law with respect to the underlying issues in litigation." *Harris v. Board of Supervisors, Los Angeles County*, 366 F.3d 754, 760 (9th Cir. 2004) (internal citation and quotation marks omitted).

Defendants concede that the district court applied the correct standard for a preliminary injunction. (AOB/17) Thus, the court was correct in requiring that Realtek establish that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see* ER/12 (articulating *Winter* factors). As discussed below, the district court properly applied this standard to the evidence and concluded that a conditional preliminary injunction should issue.

- 30 -

1.    **The District Court Properly Found That Realtek Is Likely To Succeed On The Merits Of Its Breach Of Contract Claim**

a.    **The Court's Ruling Was Based On Defendants' Undisputed Contract With The IEEE**

Defendants claim the district court found a breach of contract based upon a "non-existent" contractual provision and that Realtek "can point to no contractual provision that LSI breached or could have breached." (AOB/2, 18)  Wrong.  There is no dispute—and no mystery—about the contract and contractual provision at issue.

With its motion, Realtek submitted evidence that defendants were contractually obligated to license the '958 and '867 patents on RAND terms and conditions.  (SER/110-14)  That evidence showed that in January 2003 and September 2004, Agere submitted Letters of Assurance identifying those Patents (or their underlying applications) as including "one or more claims that may be required to practice" the IEEE 802.11e and 802.11g standards and stating that Agere was "prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to comply with the [Proposed] IEEE Standard." (*Id.*)  Agere submitted a substantially similar letter relating to the IEEE 802.11n standard in September 2004, but without identifying patents. (*Id.*)

Numerous other courts have found that letters of assurance to standards-setting bodies create binding contracts to license on RAND terms. *E.g.*, *Microsoft Corp. v. Motorola, Inc.*, 854 F.Supp.2d 993, 1002

(W.D. Wash. 2012) (Motorola's letters to IEEE and ITU created binding contractual commitments to license Motorola's essential patents on RAND terms); *Apple, Inc. v. Motorola Mobility, Inc.*, 2011 WL 7324582, at ** 8-10 (W.D. Wis. June 7, 2011) ("*Apple-Wis.*") (plaintiff stated viable breach of contract claim based on defendant's failure to offer RAND terms it had promised IEEE and other SSOs); *Research In Motion Ltd. v. Motorola, Inc.*, 644 F. Supp.2d 788, 797 (N.D. Tex. 2008) (same); *ESS Technology, Inc. v. PC-Tel, Inc.*, 1999 WL 33520483, at *4 (N.D. Cal. Nov. 4, 1999) ("*ESS*") (third-party beneficiary of contract between SSO and patent holder properly stated claim for specific performance of agreement requiring license on RAND terms); *see also Ericsson Inc. v. Samsung Electronics, Co.*, 2007 WL 1202728, at *1 (E.D. Tex. Apr. 20, 2007) (licensing obligations were contractual and bound all members of SSOs). Moreover, courts have held that implementers of a standard like Realtek are third party beneficiaries of such contracts. *See Apple-Wis.* at *10 (implementers are third-party beneficiaries of contract between patent holder and SSO); *ESS* at *4.

Importantly, defendants conceded

And defendants conceded in their summary judgment opposition that they had agreed to license the '958 and '867 patents on RAND terms. (ER/57) Defendants never argued below that the Letters of Assurance did not create a binding contract or that Realtek was not a third party beneficiary. (*See generally id.*)

- 32 -

The district court was accordingly correct in finding "no dispute" that "defendants entered into a binding contract with the IEEE to license their declared standard-essential patents, including the '958 and '867 patents, on RAND terms, and that Realtek is a third party beneficiary to that contract." (ER/7)  Far from being "clearly erroneous," the court's findings regarding the contract were correct and based on the uncontroverted record.

### b.    The Court Did Not Adopt A *Per Se* Rule Against Injunctive Relief

The only open merits question below was whether defendants *breached* their contractual obligation to license on RAND terms by initiating an ITC proceeding against Realtek—and thus seeking injunctive relief against it—without first offering Realtek a license. (ER/7)  The district court found on undisputed evidence that defendants did breach, based largely on this Court's decision in *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872 ("*Microsoft-Appeal*").  (ER/9-11)  This was a correct ruling.

Defendants first mischaracterize the district court's ruling as creating a *per se* rule prohibiting patent owners with RAND obligations from *ever* seeking injunctive relief against an accused infringer.  (*See, e.g.*, AOB/19, 21, 25)  Having erected this "strawman," defendants predictably proceed to knock it down, arguing that "[n]owhere in the *Microsoft* decision is any legal holding that an SEP [standard essential patent] holder may *never* seek injunctive relief, and this claim is belied by further proceedings in that case and other cases."  (AOB/25 (orig.

ital.))   But the district court did not fashion a *per se* rule against injunctive relief.   Rather, its Order was limited "to the situation here, where defendants did not even attempt to offer a license, on 'RAND' terms or otherwise, until after seeking injunctive relief." (ER/11)

Defendants also misread the *Microsoft-Appeal.*   That case involved Motorola's ownership of standard-essential patents that it offered to license to Microsoft.   696 F.3d at 877.   Microsoft considered Motorola's license offer unreasonable and sued Motorola in district court for breach of Motorola's RAND obligations.   *Id.* at 878.   In the meantime, Motorola sought an injunction in Germany to bar Microsoft from selling the allegedly infringing products there.   *Id.* at 879. Microsoft then moved the district court for a TRO and preliminary injunction to enjoin Motorola from enforcing any injunctive relief it might obtain from the German court until the district court had ruled on the RAND issues.   *Id.* at 880.   The district court ruled that Motorola had contractual RAND obligations but denied summary judgment as to whether its allegedly unreasonable offer breached those obligations.   *Id.* The court also issued an "anti-suit" injunction barring Motorola from enforcing any injunctive relief it might obtain from the German court while the district court was considering Motorola's claim for injunctive relief.   *Id.*

On Motorola's appeal of the anti-suit injunction, this Court upheld the district court's ruling that its RAND obligations created a contract that Microsoft could enforce as a third party beneficiary.   *Id.* at 887-89. The Court emphasized that implicit in the RAND promise was "at least

- 34 -

arguably, a guarantee that the patent-holder will not take steps to keep would-be users from using the patented material, *such as seeking an injunction*, but will instead proffer licenses consistent with the commitment made." *Id.* at 884 (ital. added). Indeed, "even if Motorola did not breach its contract … injunctive relief against infringement is arguably a remedy inconsistent with the licensing commitment." *Id.* at 885.

On remand, the district court ruled that any form of injunctive relief that Motorola sought was improper. *Microsoft Corp. v. Motorola, Inc.*, 2012 WL 5993202, at *7-*8 (W.D. Wash., Nov. 30, 2012) ("*Microsoft-Remand*"). The court explained that Motorola could not establish irreparable harm because the royalty payments Microsoft would make under a later-determined RAND license agreement would be an adequate remedy at law, obviating the need for an injunction. *Id.* at *6-*7. Thus, the court granted Microsoft's motion for partial summary judgment, dissolved the anti-suit injunction, and replaced it with an order prohibiting Motorola from pursuing *any* injunctive relief against Microsoft with respect to Motorola's standard-essential patents until after a RAND trial. *Id.* at *8. In effect, the district court granted partial summary judgment to stop Motorola temporarily from seeking injunctive relief against Microsoft, regardless of forum, until the RAND trial could occur.

This was precisely the relief that Realtek sought below. Applying both *Microsoft-Appeal* and *Microsoft-Remand* (among other cases), the district court found defendants' pursuit of an ITC exclusion order against

- 35 -

Realtek was "inherently inconsistent and a breach of defendants' promise to license the patents on RAND terms." (ER/9) Indeed, it noted, defendants brought the ITC action "*before* offering a license," whereas Motorola had sought injunctive relief only "*after* offering a license to Microsoft." (*Id.* (orig. ital.)) Thus, the court said, defendants' conduct was "even more glaringly inconsistent with its [sic: their] RAND obligations" than was Motorola's. (*Id.*) Accordingly, the court held that "defendants breached their contractual obligations to IEEE and to Realtek as a third party beneficiary of that contract by seeking injunctive relief against Realtek before offering Realtek a license." (ER/11)

Defendants' argument that *Microsoft-Appeal* does not support the district court's purported "*per se* rule" (AOB/21-22) is wrong for several reasons. First, as noted, the district court did not adopt a *per se* rule that a patentee with RAND obligations cannot *ever* seek injunctive relief; instead, it ruled that such a patentee cannot seek injunctive relief without first making *some* kind of license offer. Second, to the extent the court *did* articulate a "*per se* rule," defendants' suggestion that *Microsoft* declined to adopt such a rule is wrong. Defendants confuse the issues by arguing that *Microsoft-Appeal* found no "per se" breach of RAND obligations based on the alleged unreasonableness of Motorola's license offer, and thus the district court could not rely on that decision for any "per se" rule in this case. But this compares apples to oranges. The unreasonableness of defendants' license offer was not at issue in Realtek's partial summary judgment motion, so that aspect of *Microsoft-Appeal* is inapposite.

- 36 -

The Order here was based on a simple principle:  that RAND obligations require patent owners to give a prospective licensee a good faith licensing proposal *before* attempting in the ITC to exclude that licensee from importing into the United States.  The Order is consistent with other decisions in which courts have denied injunctive relief to patent holders with unsatisfied RAND obligations.  *See Apple, Inc. v. Motorola, Inc.*, 869 F.Supp.2d 901, 913-14, 923 (N.D. Ill. 2012) (Posner, J.) ("*Apple-Ill.*") (denying injunctive relief to Motorola, which had committed to license its patents on RAND terms); *Microsoft-Remand*, 2012 WL 5993202, at *7-*8 (ordering Motorola not to enforce injunctive relief against Microsoft because of Motorola's RAND licensing commitments).  And the Order was based on undisputed facts—that defendants initiated the ITC proceeding against Realtek in March 2012 without first making a license proposal regarding the standards and products at issue.  (ER/2-4, 11)

The Order was also grounded in sound policy concerns—echoed by governmental agencies and commentators—that a patentee who seeks injunctive relief gains an unfair advantage that runs contrary to its RAND commitments.  As the district court stated, "the pending threat of an exclusion order gives defendants inherent bargaining power in any RAND licensing negotiation that may now take place."  (ER/10, *citing* U.S. Dept. of Justice and U.S. Patent & Trademark Office, Joint Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments, at 6 (Jan. 8. 2013), ER/319 ("A decision maker could conclude that the holder of a F/RAND-encumbered, standards-essential patent had attempted to use an

exclusion order to pressure an implementer of a standard to accept more onerous licensing terms than the patent holder would be entitled to receive consistent with the F/RAND commitment—in essence concluding that the patent holder had sought to reclaim some of its enhanced market power"); ER/327 ("[C]ommitments to make patents available on reasonable terms matter, and … companies cannot make those commitments when it suits them—that is, to have their patents included in a standard and then behave opportunistically later, once the standard is in place and those relying on it are vulnerable to extortion."))

Likewise, a recent FTC policy statement implied that injunctive relief is totally unavailable for infringement of a patent governed by RAND commitments. *Apple-Ill.*, 869 F.Supp.2d at 914. That statement explained that a royalty negotiation that occurs under threat of an exclusion order "could allow a patentee to obtain unreasonable licensing terms despite its RAND commitment, not because its invention is valuable, but because implementers are locked in to practicing the standard." *Id.*[4]

---

[4]    As the district court noted (ER/9 n.4), when LSI was threatened with an exclusion order in another ITC case (brought by another patentee that allegedly had promised to license its patents on RAND terms), LSI argued that "[i]njunctive relief is antithetical to those promises." (SER/325) Although defendants try to distance themselves from this statement by claiming it was "directed at the facts of a particular case" (AOB/30 n.2), the statement was a general one—that injunctive relief is antithetical to RAND promises. This is the point other courts and commentators have made, even though the district court here did not adopt so broad a rule.

Indeed, for this reason, *Microsoft-Appeal* and other decisions have stated that, for RAND-encumbered patents, injunctive relief like an exclusion order may *never* be an appropriate remedy.  *See Microsoft-Appeal*, 696 F.3d at 885 (for patents alleged essential to ITU standards, "injunctive relief against infringement is arguably a remedy inconsistent with the licensing commitment."); *Apple-Ill.*, 869 F.Supp.2d 901, 913-14 ("By committing to license its patents on FRAND terms, Motorola committed to license the '898 to anyone willing to pay a FRAND royalty and thus implicitly acknowledged that a royalty is adequate compensation for a license to use that patent."); *Microsoft-Remand*, 2012 WL 5993202, at *7-*8 (ordering Motorola not to enforce any form of injunctive relief against Microsoft because of Motorola's RAND licensing commitments).

Importantly, however, the district court here did *not* create any *per se* rule prohibiting a patentee from ever seeking injunctive relief based on alleged infringement of RAND-encumbered patents.[5]   Rather, the

---

[5]    As such, defendants' reliance on *Apple, Inc. v. Motorola Mobility, Inc.*, Case No. 11-dv-178, 2012 WL 5416941, at *15 (W.D. Wisc. Oct. 29, 2012) is unavailing.  There, Motorola made a royalty offer before seeking injunctive relief, which Apple rejected.  Apple sued for breach of contract based on Motorola's alleged violation of the RAND commitments it made to the IEEE and to the European Telecommunications Standards Institute ("ETSI").  *Id.* at *1-*2.  Before trial, the parties sought an in limine interpretation of whether, as a matter of contract law, the IEEE and ETSI policies precluded Motorola from seeking injunctive relief to enforce its alleged standards-essential patents.  *Id.* at *13. The court found no language in the contracts suggesting that Motorola was prohibited from seeking injunctive relief, and thus denied Apple's motion in limine.  *Id.* at *15.

(fn. continued on next page)

court limited its holding to the present situation—where the patentee made *no* offer to license the patents before seeking injunctive relief.

### c.    The Court Correctly Found That The 2002-2003 Correspondence Did Not Satisfy LSI's RAND Obligations

Defendants claim the district court "ignored the facts" concerning LSI's 2002-2003 communications with Realtek. (AOB/29) They claim Realtek "expressly admitted that these communications manifested a license offer," such that the district court's finding that defendants did not make an offer before seeking injunctive relief was clear error. (*Id.*) This argument distorts the record and ignores the district court's reasoning.

First, the distortion—that "LSI unquestionably offered Realtek a license before naming Realtek as a respondent in its ITC complaint." (*Id.*) Although defendants rely on Realtek's "express admission" that the 2002-2003 correspondence constituted an offer, they neglect to

---

(fn. cont'd from previous page)

Because Motorola *made* a royalty offer *before* seeking injunctive relief, the court addressed the very different question of whether Motorola's RAND commitments absolutely barred injunctive relief before or after making a license offer. In other words, the court analyzed whether merely seeking injunctive relief, without more, violates RAND commitments. By contrast, the district court here considered only whether by seeking injunctive relief, without first making some kind of license offer, defendants violated their RAND obligation.

mention Realtek's explanation as to why that correspondence was irrelevant to its partial summary judgment motion.

Below, Realtek addressed defendants' argument that LSI's October 2002 letter to Realtek satisfied LSI's RAND obligations as to the '958 and '867 patents. (ER/183) As Realtek explained, that letter "addressed only the 802.11b standard and one representative Realtek product." (ER/193) Thus, although Realtek assumed for purposes of its partial summary judgment motion that the letter contained an offer, any such offer did not extend to products compatible with 802.11g or 802.11n –which are at issue in the ITC proceeding. (SER/176)

In fact, the IEEE 802.11g and 802.11n standards (not to mention the '867 patent) did not even *exist* when Agere sent Realtek the 2002 letter.

Thus, the 2002 letter *could not* have constituted an offer to license the 802.11g and 802.11n standards that would later be at issue in the ITC. The letter thus *could not* have discharged defendants' RAND obligations as to products practicing those standards. To satisfy its

6    LSI abandoned the proposal as to 802.11b after the parties stopped communicating in 2003. It then formally revoked that proposal by asserting in March 2012 that Realtek products infringe the alleged essential patents and demanding that Realtek cease and desist its alleged infringing activities. (ER/221-22)

RAND obligations, defendants were required to make an offer to license *those* Realtek products (i.e., the ones at issue in the ITC proceeding) before seeking to exclude their importation.

Second, defendants ignore the district court's explanation as to why the 2002-2003 correspondence did not satisfy defendants' RAND obligations. Notably, the court found defendants had made "no meaningful argument" that it had offered a RAND license to Realtek before initiating the ITC action. (ER/11) And it ruled the 2002-2003 correspondence regarding the IEEE 802.11b standard did not amount to a RAND offer because, as the court stated:

> (1) the 802.11b standard is neither the standard at issue in the ITC litigation nor is it the subject of the RAND commitments in Agere's Letters of Assurance to the IEEE in the record before the court;

> (2) the parties ceased communications before any specific offer was ever actually made; and

> (3) Realtek continued to sell its Wi-Fi/802.11 component parts for almost nine years thereafter without hearing from defendants, implying that defendants were no longer seeking to license their declared standard- essential patents to Realtek.

(ER/11)[7]

The district court also found that defendants' cease-and-desist letter was not a license offer that could satisfy their RAND obligations. (*Id.*)  It ruled that that letter "did not offer a license, but instead asked Realtek to immediately cease and desist from the allegedly infringing activities." (*Id.*)  "Instead of offering a license, or even waiting for a response," the court said, "defendants filed the ITC action naming Realtek as a respondent less than a week later." (*Id.*)  Defendants have not challenged these findings on appeal.

In short, the district court did not "ignore" stipulated facts, but considered the undisputed facts of the parties' 2002-2003 correspondence and subsequent communications and agreed that such correspondence did not satisfy defendants' RAND obligations.  There is nothing "clearly erroneous" about this finding.

### d.    The Court Properly Found That Realtek Was A Willing Licensee

Defendants claim the record does not support—and indeed, contradicts—the district court's finding that Realtek was a "willing licensee." (AOB/28)  Wrong.

---

[7]    As to the first of the court's points, there are in fact multiple IEEE 802.11 standards at issue in the ITC proceeding. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

First, defendants incorrectly assert that "Realtek refused to negotiate in the context of LSI's 2002-2003 correspondence." (*Id.*) The correspondence shows that Realtek responded to LSI's suggestion that Realtek take a license but that the parties ultimately dropped the issue. (ER/2-3, *citing* ER/204-19)

The district court summarized the undisputed correspondence. (*See id.*) On October 22, 2002, Agere first contacted Realtek contending that Agere "possesses essential patent claims that relate to Realtek's 802.11b-based wireless networking products." (ER/204)

Contrary to the assertion that Realtek refused to negotiate, the parties exchanged several letters over the next several months. (*Id.*) In that correspondence, Realtek requested more information regarding Agere's infringement contentions, including a "detailed analysis" between Realtek's products and Agere's alleged essential patents. (ER/215) Agere never provided the analysis, though it offered to set up a conference call to discuss claims it believed relevant. (ER/217) After Agere inquired as to the status on March 31, 2003, the parties ceased communication, and it appeared that Agere had dropped the matter. (*See* ER/219) Nothing in this evidence indicated a "refusal to negotiate."

The court's finding that Realtek was a willing licensee was thus not "clearly erroneous."

Second, defendants' argument that Realtek is a willing licensee only if "dragged kicking and screaming" (AOB/29) distorts Realtek's position. Realtek served interrogatory responses stating that it is a willing licensee of the '958 and '867 patents, "subject to all rights of appeal and to Realtek's defenses, assertions and positions" in the ITC proceeding. (ER/168) Realtek's responses reflect what the district court stated in its ruling on defendants' earlier motion to dismiss: that Realtek may simultaneously pursue a determination of the RAND rate while denying that it infringed the patents and asserting their invalidity. (SER/7-8) In stating that Realtek is a willing licensee, Realtek did not want to suggest that it was admitting defendants' patents were valid or infringed, since it vigorously contests both issues, including in the ITC proceeding. Defendants' characterization of that response as "tantamount to outright refusal" (AOB/28) lacks merit.

Defendants' assertion that Realtek's reservation of rights as a willing licensee is akin to a refusal to license is also contrary to the U.S. Federal Trade Commission's approach to F/RAND issues. For example, in *In the Matter of Motorola Mobility LLC and Google Inc.*, FTC File No. 121-0120, the FTC determined that "challenging the validity, value, Infringement or Essentiality of an alleged infringing FRAND Patent does not constitute a statement that a Potential Licensee will not license such FRAND patent...." (SER/404) Here, the mere fact that the PTO issued the '958 and '867 patents does not establish their validity, let

alone their essentiality to the 802.11 standards or infringement. Realtek is a willing licensee, but it is still entitled to contest these issues.

Defendants' attempt to distinguish various cases fails because Realtek is, in fact, a willing licensee. For example, defendants note that *Microsoft-Remand* found injunctive relief was not available "*only after the infringer agreed to take a license*, something Realtek has not done here." (AOB/23 (ital. added)) This is wrong—again because Realtek *is* willing to "take a license."

Likewise, defendants fail to distinguish *Apple-Ill.*, on which the district court also relied. (ER/10) *Apple-Ill.* involved Motorola's claims of patent infringement based on alleged standard-essential patents for which Motorola had made RAND commitments. 869 F.Supp.2d at 914. Motorola had offered a 2.25% royalty to Apple and claimed it was justified in seeking injunctive relief after Apple rejected the offer. *Id.* In analyzing whether Motorola could seek injunctive relief for alleged infringement, Judge Posner, sitting by designation, stated:

> I don't see how, given FRAND, I would be justified in enjoining Apple from infringing the '898 [patent] unless Apple refuses to pay a royalty that meets the FRAND requirement. By committing to license its patents on FRAND terms, Motorola committed to license the '898 to anyone willing to pay a FRAND royalty and thus implicitly acknowledged that a royalty is adequate compensation for a license to use that patent. *Id.* at 913-14.

Judge Posner also rejected Motorola's argument that Apple lost the RAND "safe harbor" by rejecting Motorola's initial license offer. As he explained, even if Apple had declined a proffered royalty rate, it might run the risk of a court ordering it to pay an equal or even higher royalty rate, "but that is not the same thing as Motorola being excused from no longer having to comply with its FRAND obligations." *Id.* Finally, Judge Posner concluded that damages in the form of a royalty were adequate to compensate Motorola for any alleged infringement, which also made injunctive relief improper. *Id.* at 915.

Defendants attempt to distinguish *Apple-Ill.* by arguing that Judge Posner stated an injunction was not justified "unless Apple refuses to pay a royalty that meets the FRAND requirement." *Id.* at 914. This is incorrect. The district court properly considered whether Realtek was a willing licensee, noting that the patent holder may obtain an injunction when the accused infringer "outright *refuses*" to accept a RAND license. (ER/10 (orig. ital., *citing Apple-Ill.*, at 913-14); ER/320) But "contrary to defendants' assertion here," the court said, "there is no indication that Realtek is *not* willing to accept a RAND license." (ER/10 (orig. ital.)) The court thus rejected the argument that Realtek's reservation of its rights to maintain its defenses to LSI's patents rendered it an "unwilling" licensee. (*Id.*)

  e. **The Court Properly Denied Defendants' Request For A Discovery Continuance**

Defendants also challenge the district's court's denial of their request for a continuance of Realtek's motion under Federal Rule of

Civil Procedure 56(d).  To that end, they present a laundry list of purported essential facts and expert discovery that was incomplete when Realtek filed its motion.  (AOB/12-14)  The district court properly considered and rejected these arguments.

To obtain a continuance, defendants had to show: (1) evidence indicating a likelihood that controverting evidence existed concerning a material fact; (2) reasons why such evidence hadn't been discovered or obtained earlier; (3) the steps or procedures defendants proposed to obtain such evidence within a reasonable time; and (4) an explanation of how that evidence would defeat Realtek's pending summary judgment motion.  *See, e.g., Nicholas v. Wallenstein*, 266 F.3d 1083, 1088-89 (9th Cir. 2001) (no abuse of discretion in denying motion for continuance where plaintiffs did not make clear what information was sought and how it would preclude summary judgment).  Defendants failed to meet that burden.

As Realtek explained below, defendants' Rule 56(d) request was improper because it was directed to discovery that was not necessary to meet the partial summary judgment motion.  (*See* SER/24-28)  That motion was limited to Realtek's breach of contract claim, which asserted that defendants breached their RAND obligations by initiating the ITC proceeding without first making a license offer.  None of the purportedly missing and "essential" discovery would have defeated the motion since none could have altered the undisputed evidence of defendants' pre-ITC proceeding conduct.  Rather, that discovery related to *later*

determinations—such as the proper RAND royalty rate, an issue for trial.[8]

Even if some of the requested discovery was "essential," defendants' Rule 56(d) request was improper because, despite many opportunities, defendants had not diligently sought the identified depositions from Realtek. *See Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1027 (9th Cir. 2006) (rule 56(d) request lacks merit if requesting party had ample opportunity to conduct discovery); *Beneficial Standard Life Insurance Co v. Madariaga,* 851 F.2d 271, 277 (9th Cir. 1988) (district court's six-month discovery period "more than sufficient" to permit plaintiffs to conduct discovery).

---

[8]    Defendants sought discovery on many topics concerning Realtek's licensing policies and the royalty rates it paid for other 802.11 patents. (AOB/13 (topics 1-3, 16-17, 22, 28)) But the determination of a RAND rate was not at issue in Realtek's motion; rather, it was reserved for trial. Defendants also claimed discovery was needed on Realtek's evaluation of defendants' patents and the actions it took concerning defendants' June 2012 proposal. (*Id.* (topics 10 & 23)) That discovery was also not essential because Realtek's motion was grounded on defendants' failure to provide *any* offer before initiating the ITC action and thus did not implicate Realtek's response to the June 2012 proposal. Similarly, defendants claimed discovery was needed on Realtek's awareness of and dependence on defendants' Letters of Assurance and RAND commitments. (*Id.* (topics 5, 9, 11, & 15)) None of that evidence was essential either, as it related to Realtek's promissory estoppel claim. Finally, although Realtek's willingness to accept a court-determined RAND rate was relevant, defendants obtained discovery on this point— Realtek agreed to accept such a rate, subject to whatever rights it may have to challenge a rate it believes is improper. (*Id.* (topic 20); SER/305)

Discovery in this case began August 24, 2012, but defendants waited until February 26, 2013 to ask Realtek to take depositions. (SER/54)  In fact, because of the time required to locate appropriate witnesses and make travel arrangements from Taiwan, Realtek repeatedly pressed defendants to identify deposition topics and witnesses, beginning with the parties' September 28, 2012 Joint Case Management Statement and continuing into 2013.  (SER/50 ("we told you that to schedule depositions in the United States (or anywhere else for that matter); we needed names and deposition topics"); 432)  But defendants deferred all deposition requests until less than five weeks before the April 2, 2013 evidentiary hearing in the ITC proceeding, when Realtek was otherwise engaged in preparing witnesses to testify. Defendants had every opportunity to seek depositions for more than six months and still offered no excuse for this delay.

**2.    The District Court Correctly Found That Realtek Established A Threat Of Irreparable Harm**

Defendants challenge the district court's finding of irreparable harm on the grounds that: (1) Realtek unreasonably delayed in seeking injunctive relief; and (2) the only harm Realtek identified was speculative and compensable in damages.  (AOB/31)  Neither challenge succeeds.

### a. The Court Correctly Rejected Defendants' Argument That Realtek's Request For Preliminary Injunctive Relief Was Untimely

The district court properly rejected defendants' argument that Realtek's motion was untimely. (ER/12 n.5) Realtek brought its motion as one for partial summary judgment well before the deadline for dispositive motions and after conducting the discovery needed to establish the absence of any triable factual issue. Notably, defendants did not make a witness available on numerous topics until more than five months into fact discovery.

For example, Realtek noticed the FRCP 30(b)(6) deposition topics necessary to confirm defendants' contractual obligations to the IEEE on August 24, 2012, the same day discovery began. (SER/30, 33-48) Realtek needed to take defendants' deposition to confirm that there were no triable factual issues, including with respect to defendants' pre-ITC conduct and the impact of a RAND obligation on possible injunctive relief. Defendants, however, did not produce the witness until more than five months had passed. (SER/30-31) Realtek then filed its summary judgment motion less than two months after defendants made their 30(b)(6) witnesses available. Thus, defendants were largely to blame for any delay in the filing of Realtek's motion.

In addition, Realtek customers had raised concerns about the ITC proceeding shortly before Realtek filed its motion. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

As such, the threat of an exclusion order issuing was causing immediate and irreparable harm to Reatek's reputation and customer relationships. Defendants did not object to or refute this evidence. Accordingly, the district court properly found that Realtek's motion was timely, given that it "brought the motion soon after one of its major customers contacted it with concerns about the ITC litigation." (ER/12 n.5)

Moreover, as the district court found, Realtek timely filed its motion at the time it was facing the threat of irreparable harm. The trial in the ITC matter took place in April 2013, with an initial determination and possible exclusion order set for July 2013. Realtek thus filed its motion when the threat of irreparable harm was most imminent. Although defendants complain that filing the motion shortly before the ITC evidentiary hearing amounted to "gamesmanship" (AOB/32), that complaint rings hollow. Defendants ignore that their own improper filing of the ITC proceeding (in violation of their RAND obligations) necessitated this action in the first place. Defendants, not Realtek, chose to initiate an ITC proceeding instead of trying to negotiate a license with Realtek at arm's length, and then delayed noticed depositions for over five months.

The district court did not err in finding Realtek's motion was timely. Realtek filed that motion after having been permitted to take the necessary discovery (after delays by defendants) and gave defendants an opportunity to take any discovery needed for the motion. *See, e.g.,*

*Mandrigues v. World Sav., Inc.* 2008 WL 5221074, *4 (N.D. Cal. Dec. 12, 2008) (granting preliminary injunction after 14-month delay; "'reasonable delay caused by a plaintiff's good faith efforts to investigate' the case will not preclude the required showing" (internal citations omitted)).    Finally, given Realtek's strong showing of likelihood of success on the merits—that there was both a likelihood of success and no factual dispute regarding liability—Realtek needed only to make a minimal showing of irreparable harm.  *See Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (*Winter* "did not alter our authority to balance the elements of the preliminary injunction test, so long as a certain threshold showing is made on each factor").

> **b.    The Court Correctly Found That Without A Preliminary Injunction, Realtek Would Suffer Irreparable Harm To Its Reputation, Customer Relationships, And Business**

Also lacking merit is defendants claim that Realtek's alleged irreparable harm was speculative and compensable by money damages. (AOB/33-34)

Defendants mischaracterize the alleged harm as simply a "revenue loss," which they then claim is "not 'irreparable'" as a matter of law. (AOB/33)  But as Realtek showed below, the threat that an exclusion order would result in a ban of Realtek's products from the U.S. market would cause Realtek substantial and *irreparable* harm to Realtek's entire chip business.

Indeed, Realtek proffered evidence that the threat of an exclusion order was *already* damaging its reputation and customer relationships. (ER 87) Although "loss of revenue" is compensable by money damages, loss of market share, damage to reputation, and damage to customer relationships have repeatedly been found to constitute irreparable harm. *See, e.g., Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.* 240 F.3d 832, 841 (9th Cir. 2001) ("threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm"); *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (intangible injury to goodwill and advertising efforts qualify as irreparable harm).

Second, defendants are wrong that Realtek's irreparable harm evidence was "speculative." (AOB/33) Defendants did not object to this evidence or proffer any contradictory evidence or create any dispute that could refute Realtek's showing. The district court thus correctly found that "defendants do not dispute in their opposition papers to Realtek's motion for partial summary judgment that Realtek *would* suffer irreparable harm

in the event that Realtek's products practicing the 802.11 standard were subject to an exclusion order." (ER/13)[9]

### 3. The District Court Properly Found That The Balance Of The Equities And The Public Interest Favored A Preliminary Injunction

Defendants' challenge to the district court's balancing of the equities (AOB/34-35) is misguided. As the district court correctly found, if Realtek's products were excluded from the United States, Realtek would either "(1) lose its customers who sell, use, or import Realtek's component parts into the United States, or (2) be forced to negotiate a license in the disadvantaged position of having an exclusion order hanging over its head." (ER/13) Defendants claim this finding fails as based on erroneous conclusions about Realtek's customers, but as noted, that claim lacks merit. Likewise, their assertion that Realtek is an unwilling licensee—and thus could not be disadvantaged in any license negotiations—(AOB/35) is contrary to the evidence and the district court's findings. Finally, their assertion that Realtek could avoid this "disadvantaged position" by simply negotiating a license (*Id.*) is nonsensical. As the record and the law show, the filing of the ITC action without first making a license offer created an *inherently unfair* licensing

---

9    Defendants claim they *did* dispute the irreparable harm finding in two conclusory assertions in their summary judgment opposition—that Realtek's irreparable harm claim was generally "speculative" and that there was "no relevant harm" to Realtek. (AOB/34, *see* ER/64) Those assertions did not create any factual issue, however, and defendants made no evidentiary objection to Realtek's showing, as the local rules require. *See* N.D. Civ. L.R. 7-3.

environment. That is a problem that could only be cured, if at all, by withdrawing its improperly filed ITC action, not by requiring Realtek to proceed with the unfair negotiations.

Conversely, as the district court properly found, defendants were not similarly prejudiced by a preliminary injunction. (ER/13) Importantly, they provided no evidence of harm (let alone irreparable harm) that they would suffer if their ability to enjoin Realtek was delayed pending a full-blown RAND trial. They submitted nothing to rebut Realtek's evidence or shift the balance of hardships in their favor. To the contrary, as the district court found, after the court has determined defendants' RAND obligations and defendants comply with those obligations (*i.e.*, by offering Realtek a license on RAND terms instead of under present threat of exclusion order), defendants may then pursue any injunctive relief that may be appropriate. (*Id.*)

Defendants are wrong that they will suffer prejudice by being "categorically barred from seeking injunctive relief for the '958 and '867 patents" and that this would "impact LSI's ability to enforce its rights in these patents against other infringers." (AOB/35) First, as noted, the district court did not categorically bar defendants from seeking injunctive relief, but held that they could not seek such relief without having first made a RAND offer. Second, defendants' argument contradicts the district court's ruling, which provides that LSI *could* seek injunctive relief, as appropriate, once its RAND obligations had been determined and met. Third, their argument that the preliminary injunction affects its rights against other potential infringers is wrong, as

- 56 -

the district court's ruling is limited to "enjoining defendants from enforcing any exclusion order or injunctive relief by the ITC that they might obtain *against Realtek* with respect to the '958 and '867 [patents]." (ER/14, ital. added)

In sum, Realtek submitted substantial and uncontroverted evidence that the threat of irreparable harm it is facing is substantial and far exceeds any perceived harm to defendants. The district court's balance of hardships ruling was thus correct.

Finally, defendants acknowledge that the district court considered the public interest factor and found that "the preliminary injunction serves the public interest by 'mak[ing] clear that commitments to make patents available on reasonable terms matter." (AOB/36, *citing* ER/13) Notably, the district court further found that a preliminary injunction was supported by *Microsoft-Appeal,* which "ensur[es] standard essential patents are accessible to all comers under RAND terms" and "permit[s] [Realtek's] customers, who rely on [Realtek's Wi-Fi component parts], to conduct business uninterrupted." (ER/13)

Defendants' sole claim is that this finding was "based on the faulty premise that RAND commitments bar injunctive relief." (AOB/36) This is a faulty premise, however. The district court did *not* rule that defendants' RAND commitments created an absolute bar to injunctive relief. Rather, its ruling was "limited to the situation here, where defendants did not even attempt to offer a license, on 'RAND' terms or otherwise, until after seeking injunctive relief." (ER/11)

- 57 -

# VII

# CONCLUSION

This Court should dismiss defendants' appeal because there is no preliminary injunction in effect from which an appeal lies. Assuming this Court has jurisdiction, this Court should conclude that the district court did not abuse its discretion in issuing the preliminary injunction and affirm the order in all respects.

DATED: October 28, 2013.

Respectfully submitted,

REED SMITH LLP

By_____*/s/ Paul D. Fogel*_____
       Paul D. Fogel
       Attorneys for Plaintiff and Appellee
       Realtek Semiconductor Corporation

## STATEMENT OF RELATED CASES

Realtek is unaware of any other cases pending before this Court that are related to this case.

DATED: October 28, 2013.

REED SMITH LLP

By_____*/s/ Paul D. Fogel*_____
       Paul D. Fogel
       Attorneys for Plaintiff and Appellee
       Realtek Semiconductor Corporation

# CERTIFICATION OF COMPLIANCE

1.     This Appellees' Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,600 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This Appellees' Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Office Word 2010 in 14 point Times New Roman.

Executed on October 28, 2013, at San Francisco, California.


_____*/s/ Paul D. Fogel*_____
Paul D. Fogel

# CERTIFICATE OF SERVICE

I hereby certify that, on October 28, 2013, I electronically filed the foregoing Appellees' Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate CM/ECF System.

I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the Appellate CM/ECF System.

Dated: October 28, 2013.

_____ */s/ Paul D. Fogel* _____
Paul D. Fogel